**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDOLPH MAYS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-01439 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| KEVIN OSTAFIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Randolph Mays was stopped by two Chicago Police Department ("CPD")

officers in August 2014. The ensuing pat-down search uncovered Mays's identification, which

when run through a CPD database led to the discovery of an investigative alert for Mays relating

to a 2013 shooting. Mays was then arrested, later charged, and eventually found guilty in state

court of various offenses related to the shooting. In this federal lawsuit, Mays now challenges,

among other things, the CPD officers' reliance on the investigative alert as providing probable

cause for his arrest. His Third Amended Complaint ("3AC"), which is now the operative

complaint, asserts various claims for violations of his constitutional rights against the City of

Chicago ("City") and a number of individual CPD officers. Before the Court are Defendants'

motions to dismiss all but one count as to one officer pursuant to Federal Rule of Civil Procedure

12(b)(6). (Dkt. Nos. 183, 200.) For the reasons stated below, Defendants' motions are granted in

part and denied in part.

**BACKGROUND**

For purposes of the motions to dismiss, the Court "accept[s] all well-pleaded facts as true

and draw[s] all reasonable inferences in favor of the non-moving party." *Bell v. City of Country

Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016). In addition, because Mays is proceeding *pro se*,

the Court construes his complaint "liberally, holding it to a less stringent standard than formal pleadings drafted by lawyers." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (internal quotation marks omitted). The 3AC alleges as follows.

On August 2, 2014, two CPD officers searched Mays and arrested him without a warrant based on an investigative alert. (3AC ¶¶ 11, 46, Dkt. No. 172.) Mays alleges that the officers, Kevin Ostafin and Scott Workman, had blocked traffic with their police vehicle and were stopping and searching any passersby. (*Id.* ¶ 12.) When they stopped Mays, Ostafin questioned him about narcotics and conducted a pat down. (*Id.* ¶¶ 13, 15.) During the pat down, Ostafin found Mays's identification, which he removed and handed to Workman to run through the CPD's Criminal History Records Information System ("CHRIS"). (*Id.* ¶¶ 15–16.) At that point, Workman gestured to Ostafin to detain Mays. (*Id.* ¶ 17.) The sole basis for detention was an investigative alert discovered when Workman entered Mays's name into CHRIS. (*Id.* ¶¶ 54, 68.) The alert had been issued on September 29, 2013—almost a year before the stop. (*Id.* ¶ 68.)

Mays raises several issues regarding the propriety of the investigative alert. First, he alleges that the issuing officer had admitted that there was no probable cause to issue the alert (albeit without alleging how or in what manner the officer made the admission); rather, the alert was issued because Mays was linked to the underlying crime by the victim's uncle, who Mays claims did not witness the incident. (*Id.* ¶¶ 73–74.) Next, Mays alleges that the alert had expired by the time of his arrest. (3AC ¶¶ 20, 23, 61; Pl.'s Resp. to Mot. to Dismiss ("Pl.'s Resp.") at 23–25, Dkt. No. 228.) Finally, Mays alleges that when Workman entered his information into CHRIS, the investigative alert that appeared stated there was "No Probable Cause to Arrest (EXPIRED)." (3AC ¶ 20.) According to Mays, Workman then changed the text of the alert to read that there *was* probable cause to arrest. (*Id.* ¶ 21.) The change in the alert's probable cause

status occurred either during or shortly after Workman placed a phone call to CPD Detective Dewilda Gordon to confirm whether there was probable cause to arrest Mays. (*Id.* ¶¶ 58–60.)

After the call with Gordon—and after they allegedly changed the status of his investigative alert—the officers took Mays to the station for an interrogation, which was conducted by Gordon and CPD Detective Paul Galiardo. (*Id.* ¶ 62.) The detectives read Mays his *Miranda* rights when he refused to speak, leaving him in the interrogation room for an hour before moving him to a holding cell, and then placed him in a physical line-up. (*Id.* ¶¶ 24–25.)

The 3AC asserts several claims based on the above events. Each count, unless otherwise specified, implicates all Defendants. All are brought pursuant to 42 U.S.C. § 1983. Count I alleges a violation of Mays's Fourth Amendment rights due to his unlawful initial stop. Count II alleges a violation of his Fourth Amendment rights due to the unlawful search following the stop. Count III alleges false arrest and false imprisonment in violation of his Fourth Amendment rights. And Count IV alleges an illegal seizure also in violation of his Fourth Amendment rights. In addition, Count V seeks to hold the City liable under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), claiming that the investigative alert policy violates his Fourth and Fourteenth Amendment rights. Count VI asserts a claim against the City for alleged violations of Mays's Fourteenth Amendment equal protection and due process rights. Finally, Count VII alleges a violation of Mays's Fourth Amendment right to receive a timely probable cause determination as articulated in *Gerstein v. Pugh*, 420 U.S. 103 (1975).

Defendants have filed two motions to dismiss the 3AC. The first, brought by the City, Ostafin, Workman, Gordon, and Galiardo, asserts that all seven counts—with the exception of Count II as to Ostafin—should be dismissed for failure to state a claim. (Dkt. No. 183.) The second, brought by Defendants Thomas Barnett, Lisa Chibe, and Edward Panosh, joins the first

motion and additionally asserts that Mays's claims against those three Defendants are barred by the statute of limitations. (Dkt. No. 200.)

## DISCUSSION

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

### I. Counts I, III, and IV—Unlawful Stop, False Arrest, and Unreasonable Seizure

Defendants argue that Counts I, III, and IV of Mays's 3AC are barred by the doctrine of collateral estoppel because the issues they raise were previously litigated in connection with a motion to suppress in Mays's state court criminal proceeding. In addition, Defendants contend that Counts III and IV are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), that Mays's arrest was supported by probable cause, and that they are entitled to qualified immunity.

#### A. Mays's Fourth Amendment Claims

As an initial matter, Mays's claims in Counts I through IV center around the validity of the investigative alert and whether it provided probable cause for his arrest. There are two types of investigative alert: one that provides probable cause to arrest, and another that does not. *Taylor v. Hughes*, 26 F.4th 419, 436 (7th Cir. 2022). The system effectively operates to impute probable cause to arrest from the officer issuing the investigative alert to the CPD as a whole

because "one officer's determination of probable cause may be imputed to other officers in the department, who may arrest on the basis of the first officer's finding." *Id.* Warrantless arrests supported by probable cause are constitutionally permissible. *United States v. Watson*, 423 U.S. 411, 417–24 (1976). Thus, investigative alerts allow an officer who has found probable cause to arrest a particular person to enter that information into a CPD-wide system, which other officers are able to access and, if those other officers encounter that person, they may arrest him even if the arresting officer's encounter does not independently establish probable cause to arrest.

Count I addresses Mays's initial stop on August 2, 2014; specifically, Mays contends that the officers did not have reasonable suspicion to stop him. Reasonable suspicion "exists when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a limited intrusion into privacy. *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (internal quotation marks and alterations omitted). Mays alleges that Ostafin and Workman stopped him without reasonable suspicion when he was not doing anything wrong. Instead, according to Mays, Workman had blocked traffic with his vehicle, and Ostafin was "randomly stopping and searching everyone in his path." (3AC ¶ 12.)

Following the initial stop, Ostafin searched Mays. Mays challenges this search in Count II, which Defendants do not contend is barred by collateral estoppel and which is discussed in greater detail below. Count III centers on what happened next: Ostafin recovered Mays's identification in the search, after which the officers ran Mays's name, handcuffed him, and placed him in the police vehicle without administering *Miranda* warnings. (*Id.* ¶¶ 16–18.) Mays claims that this constituted a false arrest and false imprisonment. Notably, an officer may arrest a person without an arrest warrant only if they have probable cause to arrest, which exists "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which

[he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004). Probable cause to arrest can be imputed from one officer to another "[w]hen law enforcement officers are in communication regarding a suspect." *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). Mays alleges that he was arrested because of an investigative alert discovered when the officers ran his name. (3AC ¶ 19.) And he claims that there was neither a warrant nor probable cause for his arrest. (*Id.* ¶ 46.)

Count IV is labeled a claim for unreasonable seizure. It is not entirely clear what distinction Mays intends to draw between the false arrest/false imprisonment claim in Count III and the unreasonable seizure claim in Count IV. But it appears that Count III focuses on the alleged inability of an investigative alert to provide probable cause for an arrest in the absence of a warrant, while Count IV suggests something more akin to a claim for fabrication of evidence. Specifically, in support of Count IV, Mays alleges that when the officers arrived at the police station with Mays, he noticed that his investigative alert was labeled: "NO PROBABLE CAUSE TO ARREST (EXPIRED)." (*Id.* ¶ 20.) But then, Workman placed a phone call to Gordon to confirm the alert's status, during which Workman began speaking in hushed tones and the investigative alert was altered to read that there was, in fact, probable cause to arrest. (*Id.* ¶ 60.) Claims that officers falsified evidence leading to pretrial detention are governed by the Fourth Amendment. *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021).

### B.    Collateral Estoppel

Defendants argue that Counts I, III, and IV are barred by the doctrine of collateral estoppel based on a suppression hearing in Mays's state court criminal proceeding. To determine the preclusionary effect of the state court's ruling, this Court must look to Illinois law. *Sanchez v.*

*City of Chicago*, 880 F.3d 349, 356 (7th Cir. 2018). Under Illinois law, a party may not relitigate an issue if (1) the issue in the present litigation is identical to that in the prior litigation, (2) "there was a final judgment on the merits in the prior adjudication," and (3) "the party against whom estoppel is asserted was a party . . . to the prior adjudication." *Id.* at 357 (quoting *Du Page Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 849 (Ill. 2001)). Illinois's preclusion law applies to pre-trial rulings in criminal trials. *People v. Owens*, 464 N.E.2d 252, 255 (Ill. 1984). This includes motions to suppress, unless "'additional evidence' or 'exceptional circumstances' are present." *Brimage v. Fowler*, No. 15 C 4970, 2020 WL 5979605, at *3 & n.7 (N.D. Ill. Oct. 8, 2020) (quoting *People v. Miller*, 464 N.E.2d 1197, 1199 (Ill. App. Ct. 1984)).

According to Defendants, because a state court judge found in the suppression hearing that the investigative alert provided probable cause to arrest Mays, he cannot relitigate that issue here. As support, they have included with their motion to dismiss a partial transcript from Mays's suppression hearing in state court,[1] which they contend establishes that he has already litigated three issues: the propriety of the investigative alert, whether his arrest was supported by probable cause, and whether police approaching Mays violated his constitutional rights. Mays was a party in his state court criminal case and there was a final adjudication on the merits. So the question for collateral estoppel purposes is whether Mays now raises identical issues as raised in the state court motion hearing. If the state court ruling in fact established that the officers had probable cause to arrest Mays, his false arrest and imprisonment claims are not

---

[1] The Seventh Circuit has approved of taking judicial notice of state court transcripts. *White v. Gaetz*, 588 F.3d 1135, 1137 n.2 (7th Cir. 2009). State court transcripts may also be used in connection with motions to dismiss to evaluate collateral estoppel claims. *Cameron v. Patterson*, No. 11 C 4529, 2012 WL 1204638, at *3–4 (N.D. Ill. Apr. 10, 2012). As such, the Court may consider the transcript from the suppression hearing in connection with Defendants' motion to dismiss without converting it to a motion for summary judgment. *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022).

cognizable. *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013); *see also Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) ("[S]o long as there is *a* reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed.").

When asked at the hearing what he sought to suppress, Mays's counsel responded that "we are challenging the investigative alert itself." (Mot. to Dismiss, Ex. E ("Suppression Hr'g Tr.") at 5:2–3, Dkt. No. 183-6.) The basis for the challenge was that the investigative alert was issued roughly one year before Mays's August 2014 arrest, but on the day of his arrest, officers had no probable cause to approach Mays, let alone arrest him. (*Id.* at 6:12–19.)[2] Although the propriety of the investigative alert was directly raised in the suppression hearing, Mays's counsel did not question Ostafin about whether the alert was active or expired. She did ask what an investigative alert is and how they are issued; and Ostafin, at one point, answered that he had confirmed with Gordon that it was a valid investigative alert and that Gordon instructed Ostafin to bring in Mays for processing. (*Id.* at 10:13–11:22.)

Mays alleges here that it was during or shortly after the conversation with Gordon that his investigative alert was altered from one without probable cause to arrest to one with probable cause to arrest. (3AC ¶¶ 20–21.) Mays seems to believe that at the point in the suppression hearing when Ostafin said the investigative alert provided probable cause to arrest, his attorney should have raised the issue of the officers changing the probable cause determination. But his attorney's failure to challenge the alert's validity on that ground, or a newfound desire on Mays's

---

[2] It is unclear why Mays's defense counsel implied that probable cause was necessary for the officers to "approach" Mays, when no cause for suspicion is necessary for officers to approach a person for a consensual encounter, *United States v. Nobles*, 69 F.3d 172, 180 (7th Cir. 1995), and only reasonable suspicion (a lesser standard than probable cause) is needed for officers to conduct a brief investigatory stop. *See United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

part to do so now, cannot avoid preclusion—particularly where the new argument is based on evidence that was within Mays's knowledge at the time of the suppression hearing. *Miller*, 464 N.E.2d at 1199 ("[I]t is not sufficient that the defense has discovered a new argument.").

The transcript of the oral ruling from the suppression hearing establishes that the state court judge held:

> Regardless to whether the detectives had an arrest warrant or not, the investigative alert was issued in the year before and there was ongoing investigation. It is entered into the system and there is no reason to suppress the investigative alert and there is no need—there was nothing in the [F]ourth [A]mendment of—any violation of the [F]ourth [A]mendment ***preventing them to approach***.

(Suppression Hr'g Tr. At 23:2–10 (emphasis added).) The state court, then, had the issue of the propriety of the initial stop squarely before it, ruling that there was no "violation of the [F]ourth [A]mendment preventing them to approach." (*Id.* at 23:6–10.) Indeed, Mays's counsel expressly raised the propriety of the stop. (*Id.* at 6:17–19 ("The officers arresting him did not have any probable cause to approach him on that day, let alone arrest him.").) While two pages directly preceding the ultimate ruling are not included in the transcript, the testimony and ultimate ruling on this point are easily discernible: the initial stop was permitted because of a valid investigative alert. Accordingly, Mays is precluded from relitigating the validity of the initial stop in Count I of the 3AC.

But it is not so clear from the current record that the state court judge actually found that the investigatory alert provided probable cause to arrest Mays, which is the subject matter of Counts III and IV. When Defendants submitted the state court transcript as an exhibit to their motion to dismiss, they submitted a version missing the two pages directly preceding the state court's ruling. Given this gap, it is not clear whether the state court went any further than finding that the officers had reasonable suspicion to stop Mays.

9

Put simply, officers must have probable cause to arrest a person without a warrant, and contrary to Defendants' assertions, the Court cannot determine from the incomplete record before it whether the state court determined that Ostafin and Workman had probable cause to arrest Mays. While the partial transcript shows that the state court judge found that "there is no reason to suppress the investigative alert," (Suppression Hr'g Tr. at 23:7), and that the alert was issued "in the year before" (*id.* at 23:4), it is silent on whether the state court found that the alert provided probable cause to arrest. As noted above and illustrated by the CPD's policy on investigative alerts, also submitted by Defendants as an exhibit,[3] there are two types of investigative alert: one that provides probable cause to arrest and one that does not. (Mot. to Dismiss, Ex. K ("Special Order S04-16") § IV.A, Dkt. No. 183-12.) Drawing inferences in Mays's favor, it is plausible that there was an investigative alert issued in the year before his arrest that ***did not*** provide probable cause for arrest—indeed, this is precisely what he alleges. Without a complete transcript from the state court, the Court cannot find that Counts III and IV are barred by collateral estoppel, particularly at the motion to dismiss stage.

### C. *Heck v. Humphrey*

Defendants also argue that Counts III and IV are barred under *Heck*, which requires that a district court dismiss a § 1983 suit brought by a state prisoner if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the plaintiff can show that the underlying conviction was already invalidated in some way. *Heck*, 512 U.S. at

---

[3] The 3AC references the CPD policy at issue, Special Order S04-16, by name. (*E.g.*, FAC ¶ 79.) The policy is thus "referred to in the plaintiff's complaint and . . . central to his claim," and the Court may consider it in connection with the motion to dismiss without converting it to one for summary judgment. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013).

487. Mays responds that his claims address the propriety of his arrest and do not necessarily undermine his conviction if successful.

Because Mays does not argue that his underlying conviction has already been invalidated, the question is whether a ruling in Mays's favor would necessarily imply his conviction's invalidity. *Tolliver v. City of Chicago*, 820 F.3d 237, 242 (7th Cir. 2016). It would not. In Counts III and IV, Mays challenges the constitutionality of his arrest, not his conviction itself. "Because an illegal search or arrest may be followed by a valid conviction, a conviction generally need not be set aside in order for a plaintiff to pursue a § 1983 claim under the Fourth Amendment." *Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir. 1995); *see also Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("Fourth Amendment claims as a group do not necessarily imply the invalidity of a criminal conviction, and so such claims are not suspended under the *Heck* bar to suit."). As the Court reads Mays's complaint, he does just that: challenge the validity of his arrest rather than argue that he should not have been convicted. Accordingly, *Heck* does not provide a basis on which to dismiss Counts III and IV.

### D. Additional Arguments

Defendants raise several other arguments in support of dismissing Counts III and IV. For the most part, those arguments ignore Mays's allegation that the investigative alert's probable cause designation was changed after Workman and Ostafin detained him from an alert without probable cause to one with probable cause.[4]

First, Defendants argue that Mays has pleaded himself out of court by alleging that they had probable cause to arrest him. This argument fails. Although Defendants contend that the

---

[4] The Court observes that Ostafin's testimony at the suppression hearing confirms that he called Gordon after seeing the investigative alert for Mays. (Suppression Hr'g Tr. at 11:9–22.)

issue was previously litigated in state court, for reasons explained above, the Court does not so find. Defendants also argue that Workman and Ostafin confirmed with Gordon that the investigative alert provided probable cause to arrest Mays. But this argument ignores Mays's allegations suggesting that the officers decided to change the basis for the alert after picking him up. True, he alleges that they called Gordon to confirm the alert. But he also alleges that during or shortly after that call, the officers altered the alert to one with probable cause attached. Drawing all reasonable inferences in Mays's favor, as the Court must at the motion to dismiss stage, it is plausible to infer that the officers took Mays into custody based on an investigative alert without probable cause and, when they realized what they had done, falsified his investigative alert's probable cause designation to justify their unlawful arrest.

Next, Defendants argue that the investigative alert justified the arrest. For similar reasons, this argument fails. Defendants again rely on a selective reading of Mays's complaint—he does not simply allege that Workman and Ostafin confirmed there was probable cause to arrest him; rather, he alleges that they changed the designation of his investigative alert from one without probable cause to one with probable cause. Next, Defendants point to the investigative alert itself, which Mays references in the 3AC and which Defendants also submitted as an exhibit. (Mot. to Dismiss, Ex. J ("Investigative Alert"), Dkt. No. 183-11.)[5] But the fact that the investigative alert as it exists today indicates that there is probable cause to arrest Mays does not definitively resolve the issue. Indeed, Mays himself alleges that the alert said this—after officers falsified it to read that there was probable cause. That the investigative alert matches his allegations does not undermine his account of how it ended up in that status. In addition, the

---

[5] Mays references his investigative alert throughout his complaint and it is central to his claims. Therefore, the Court may consider it without converting his motion to dismiss into one for summary judgment. *Burke*, 714 F.3d at 505.

investigative alert states that it is "EXPIRED." (*Id.*) Neither Defendants' brief nor Special Order S04-16 explain what "EXPIRED" means. Drawing all inferences in Mays's favor, Defendants' exhibit supports his allegations and does not merit dismissal.

Finally, Defendants raise undeveloped qualified immunity arguments. They go no further than to state that qualified immunity protects Ostafin and Workman because their reliance on investigative alerts is appropriate and, elsewhere, that "[s]ince there was a basis for a reasonable officer to conclude there was probable cause to arrest Plaintiff based on the investigative alert, qualified immunity bars claims that there was not." (Mot. to Dismiss at 8, Dkt. No. 183.) But once again, this claim ignores Mays's allegations that the "expired" investigative alert did not state that there was probable cause to arrest him until after Ostafin and Workman conspired to change it. The Court also notes that Defendants' argument is cursory and undeveloped, despite the fact that they bear the burden to establish qualified immunity. *See Hood v. Smith*, 15 C 7945, 2017 WL 2404974, at *3 (N.D. Ill. June 1, 2017) ("Beyond citing the qualified immunity standard, [defendant] barely addresses qualified immunity for [plaintiff's] failure to protect claim, which is insufficient to put the defense at issue.").

For these reasons, Defendants' motion to dismiss is denied as to Counts III and IV.

## II.     Count II—Illegal Search

As noted above, Defendants do not argue that Count II, in which Mays asserts that the search pursuant to which Ostafin found his identification violated the Fourth Amendment, is barred by collateral estoppel. Rather, they argue that it should be dismissed as to any Defendant for whom Mays has failed to allege personal involvement. The 3AC specifically names four officers or detectives in Count II: Ostafin, Workman, Gordon, and Galiardo. (3AC ¶¶ 33, 39.) But the only allegations involving Gordon are that Ostafin and Workman spoke to him over the radio after searching and detaining Mays. (*Id.* ¶¶ 20–21.) And Mays only alleges that Galiardo

was present during his interrogation, which took place at the station house well after the search. (*Id.* ¶¶ 23–24.)

Under § 1983, "[a] government official is liable only if he personally caused or participated in a constitutional deprivation." *Milchtein v. Milwaukee County*, 42 F.4th 814, 824 (7th Cir. 2022). So to survive a motion to dismiss, Mays must allege that the defendant, by his or her own actions, violated his Constitutional rights. *Id.* Yet Mays has not alleged any personal involvement in either the stop or the search by Gordon, Galiardo, Barnett, Chibe, or Panosh. Indeed, the only officers who participated in the stop or the search were Ostafin and Workman. And even then, Mays alleges only that Workman submitted Mays's identification to the CPD's CHRIS system and signaled to Ostafin to detain Mays. (3AC ¶¶ 16–17.) While this might sufficiently allege Workman's personal involvement in Mays's allegedly unlawful arrest and seizure (Counts III and IV), it does not support a plausible inference that Workman was directly involved in the search.

Count II is thus dismissed as to all Defendants except Ostafin because Mays has failed to plausibly allege their personal involvement in his constitutional harm.

### III. Additional Individual Defendants

What is more, although Mays's 3AC includes Barnett, Chibe, and Panosh as Defendants, its fails to allege any personal involvement in his constitutional injury by any of the three. As noted above, Count II is dismissed as to Barnett, Chibe, and Panosh. But Mays also fails to state valid claims against them based on any other theory. The only action Mays alleges that Barnett took was issuing the original investigative alert. (3AC ¶¶ 69–75.) But according to the 3AC, the investigative alert when issued was designated "No Probable Cause to Arrest" and Mays does

not challenge the original basis to issue that alert. Even if he had, such a challenge would be barred by collateral estoppel based on the state court suppression hearing.

Meanwhile, the only allegation against Panosh is that he was aware of the alleged practices underlying Mays's equal protection claim (*id.* ¶ 114(d)), and the only allegation against Chibe is that she did not correct the practices underlying his equal protection claim (*id.* ¶ 114(e)). As discussed below, however, the equal protection claim is dismissed in its entirety for failure to state a claim. And in any case, it is well-established that neither Chibe nor Panosh can be held liable in their roles as supervisors. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) (rejecting § 1983 claims against individual defendants premised on *respondeat superior* liability because "§ 1983 does not allow actions against individuals merely for their supervisory role of others").

Because Mays does not allege sufficient involvement in his alleged constitutional harms by any of Barnett, Panosh, and Chibe, his claims against them are dismissed. As a result, the Court need not reach the statute of limitations argument raised by those Defendants.

IV. **Count V—*Monell* Claim**

To plead a claim under § 1983 against a municipality, Mays must adequately allege that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Monell*, 436 U.S. at 694. The Seventh Circuit recognizes three types of municipal liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (internal quotation marks omitted). A plaintiff must also show that "the policy or custom demonstrates municipal

fault," and that "the municipality's action was the moving force behind the federal rights violation." *Id.* (internal quotation marks omitted).

Mays's claim against the City principally relies on the first prong of *Monell*, alleging that the City's express policy regarding investigative alerts unconstitutionally permits officers to arrest suspects without arrest warrants and probable cause. (3AC ¶¶ 78–80.) Specifically, Mays complains that "an investigative alert has been elevated to the status of an arrest warrant, without the constitutional safeguards provided by a judicial determination of probable cause." (*Id.* ¶ 80.) The Seventh Circuit recently considered such a *Monell* challenge to the constitutionality of the City's investigative alert policy. It concluded that, "[o]n its face . . . the investigative alerts system does not offend the Fourth Amendment." *Taylor*, 26 F.4th at 436. That is because warrantless arrests supported by probable cause are constitutional, and probable cause can be imputed from one CPD officer to another. *Id.* Post-*Taylor*, Mays's central argument that it is unconstitutional for the CPD to rely on investigative alerts rather than always obtaining arrest warrants fails as a matter of law.

In *Taylor*, the Seventh Circuit also discussed a second possible path to *Monell* liability based on "'gaps in express policies' or through 'widespread practices that are not tethered to a particular written policy'—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* at 435 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). But Mays has not pleaded a claim under this approach either. Even construed liberally, his *Monell* claim goes no further than to claim that investigative alerts resemble stop orders, they are not arrest warrants, therefore they cannot provide probable cause for an arrest, and warrantless arrests without probable cause violate the Fourth Amendment. True, Mays does go on elsewhere in the 3AC to claim that in his particular

case the arresting officers changed a "no probable cause" investigative alert to a "probable cause" investigative alert to justify his arrest; however, he does not allege either (1) that the City's investigative alert policy authorizes officers to manipulate alerts in this manner; or (2) the existence of any other instances when officers have done the same thing to other suspects, such that a plausible inference could be drawn that there is a widespread practice "in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.*

Because Mays does not plausibly allege that the investigative alert system constitutes an unconstitutional policy, pattern, or practice, his *Monell* claim against the City in Count V is dismissed.

## V.    Count VI—Equal Protection and Due Process Claims

Count VI asserts a different version of his *Monell* claim against the City by invoking the Equal Protection and Due Process Clauses of the Fourteenth Amendment.[6]

### A.    Equal Protection Claim

The Court first considers Mays's equal protection claim, in which he alleges that the City uses the investigative alert system in a manner that has a disparate impact on Black and Latino communities in Chicago. (3AC ¶¶ 96–97.) Mays contends that officers are authorized, encouraged, and trained to use investigative alerts in these communities. As noted above, the Seventh Circuit has found the investigative alert system facially constitutional. But when an otherwise permissible law is enforced selectively against a particular class of people, it can

---

[6] Mays also invokes 42 U.S.C. § 1981, but § 1981 does not apply to this case. "[S]ection 1981 itself provides a remedy for violations committed by private actors, but an injured party must resort to § 1983 to obtain relief for violations committed by state actors." *Campbell v. Forest Preserve Dist.*, 752 F.3d 665, 667 (7th Cir. 2014) (citing *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731–35 (1989)). Thus, any claim against the City pursuant to § 1981 is dismissed.

nonetheless violate the Equal Protection Clause. *Conley v. United States*, 5 F.4th 781, 788–89 (7th Cir. 2021).

To begin, while Mays refers to his claim as a disparate impact claim, such theories are not cognizable under § 1983. *Bond v. Atkinson*, 728 F.3d 690, 692–93 (7th Cir. 2013). Therefore, the Court construes his claim as asserting a selective enforcement theory. *Conley*, 5 F.4th at 788–89. Under such a theory, the enforcer's awareness that there may be—or even will be—an unbalanced result will not, by itself, sustain an equal protection claim. Rather, a plaintiff must show "that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.* at 789 (internal quotations marks omitted). Mays's claim must also meet *Monell*'s standard, which requires alleging an unconstitutional policy or practice, "that the policy demonstrates municipal fault," and that the policy or practice is the moving force behind the plaintiff's injury. *Bohanon*, 46 F.4th at 675.

Mays's equal protection claim falters for multiple reasons. First, he has not adequately pleaded that the City's investigative alert policy has a discriminatory effect and is motivated by a discriminatory purpose. To allege a discriminatory effect, Mays must plead three things: "that he is a member of a protected class, that he is otherwise similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (internal quotation marks omitted); *Sharma v. Bd. of Trs.*, 404 F. Supp. 3d 1183, 1200 (N.D. Ill. 2019). Mays, a Black man, meets the first requirement. With respect to differential treatment, he alleges that the CPD focuses its use of investigative alerts on Black and Latino communities; he alleges nothing about how investigative alerts are used in other communities but, in his response brief, states in conclusory fashion that investigative alerts are not used in majority White or Asian neighborhoods of Chicago. (3AC

¶ 98; Pl.'s Resp. at 101.) The pertinent question, however, is whether "[Mays] was treated differently from a similarly situated member of the unprotected class." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). And Mays offers no factual allegations from which to infer that a different practice is used in other parts of Chicago or against non-Black and non-Latino people in general, let alone similarly-situated ones.

Mays also must plead discriminatory intent or purpose. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Hlinak v. Chi. Transit Auth.*, 13 C 9314, 2015 WL 361626, at *5 (N.D. Ill. Jan. 28, 2015) (requiring a plaintiff to plead both discriminatory effect and discriminatory purpose to state an equal protection claim). Mays argues that intent may be inferred from practice: arrests pursuant to investigative alerts occur in "disproportionately underserved and poor communities." (3AC ¶ 98.) But "[d]iscriminatory purpose means more than simple knowledge that a particular outcome is the likely consequence of an action; rather, discriminatory purpose requires a defendant to have selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston*, 853 F.3d at 907 (internal quotation marks and alterations omitted). The facts Mays has pleaded fall short of this standard.

Finally, Mays has not adequately pleaded that the allegedly discriminatory policy or practice of using investigative alerts in Black and Latino communities was the moving force behind his injury. As noted above, *Taylor* rejected the argument that the use of an investigative alert with probable cause to effect an arrest, in and of itself, violates the Fourth Amendment. And so that cannot have been the moving force behind any constitutional injury Mays suffered.

However, Mays has also alleged that the arresting officers relied on an "expired" investigative alert and that the alert did not indicate that there was probable cause to arrest him

19

until after they changed it. Thus, the moving force behind his alleged constitutional injury was the use of an "expired" investigative alert with no probable cause attached (which was then allegedly altered to reflect probable cause) to effect his arrest. And Mays does not allege that the officers changed the investigative alert's probable cause designation because of his race or the community of which he is a member. Nor has he alleged that non-protected persons were treated differently than him in this respect. As such, Mays has failed to state an equal protection claim.

### B.    Due Process Claim

In Count VI, Mays also invokes the Due Process Clause of the Fourteenth Amendment, although it is unclear what basis he claims for an alleged violation of his due process rights. In his response brief, Mays suggests a wide-ranging due process argument, contending that the investigative alert system as a whole violates suspects' due process rights because it does not allow for consideration of exculpatory evidence, it allows for department-wide determinations of probable cause that can lead to pretextual stops, and investigative alerts are easier for police to obtain than arrest warrants, among other things. (Pl.'s Resp. at 46–49.) These arguments, however, are foreclosed by *Taylor*, in which the Seventh Circuit addressed Mays's concerns by explaining that the system does have an audit process, imputation of probable cause is a well-established doctrine, and warrantless arrests supported by probable cause are constitutionally permissible. *See Taylor*, 26 F.4th at 436. It also bears noting that an arrest pursuant to an investigative alert—like other warrantless arrests—is subject to the procedural safeguard that a probable cause determination be made by a judicial officer within a reasonable time period after the arrest. *Gerstein v. Pugh*, 420 U.S. 103, 126 (1975). Count VI is dismissed as well.

### VI.    Count VII—*Gerstein* Claim

In the final count of his 3AC, Mays alleges that he was held for four days before receiving a probable cause determination in violation of *Gerstein*.

When a defendant is arrested without a warrant, *Gerstein* requires that a probable cause determination occur within a reasonable time after the arrest. *Id.* at 126. This requirement generally demands that a probable cause hearing be held within forty-eight hours of a warrantless arrest. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991); *Mitchell v. Doherty*, 37 F.4th 1277, 1282 (7th Cir. 2022). As the Seventh Circuit has explained, "generally, a jurisdiction that provides judicial determinations of probable cause within 48 hours will comply with the promptness requirement of *Gerstein*, but an arrestee can still prove that his or her probable cause determination was delayed unreasonably when, for example, the delays were for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* at 1280 (internal quotation marks and alterations omitted).

Here, Mays alleges in Count VII that he was arrested and detained from August 2, 2014 to August 6, 2014 without a probable cause determination—a period of four days. (3AC ¶ 122.) This allegation, however, is belied by the court record, which shows that Mays did, in fact, receive a timely probable cause determination. The City has submitted a signed court order, dated August 3, 2014 at 4:05 p.m. and entered on August 4, 2014, finding probable cause to detain Mays on aggravated battery charges. (City Mot., Ex. C at 2, Dkt. No. 183-4.)[7] The warrantless arrest occurred on the morning of August 2, 2014. (3AC ¶ 11.) That is within the presumptively reasonable forty-eight hour period, and Mays has not alleged any circumstances plausibly suggesting that his probable cause determination was nonetheless unreasonably

---

[7] While a motion to dismiss is generally decided solely on the four corners of the complaint, a court may also consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Here, the Court takes judicial notice of the facts contained within the August 3, 2014 court order, including times and dates. *Fosnight*, 41 F.4th at 922.

delayed. Accordingly, Mays's claimed *Gerstein* violation cannot proceed and Count VII is dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss (Dkt. Nos. 183, 200) are granted in part and denied in part as follows. Counts I, V, and VI are dismissed as to all Defendants. Count II is dismissed as to all Defendants other than Ostafin. All other claims against Barnett, Panosh, and Chibe are also dismissed. The motions are denied as to Counts III and IV against Ostafin, Workman, Gordon, and Galiardo. Thus, in sum, Count II may proceed against Ostafin, and Counts III and IV may proceed against Defendants Ostafin, Workman, Gordon, and Galiardo.

ENTERED:

Dated:  September 30, 2023

Andrea R. Wood
United States District Judge